UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KENNETH LOCKE,

                              Plaintiff,

      -against-

ST. AUGUSTINE'S EPISCOPAL CHURCH and
HOWARD K. WILLIAMS,

                            Defendants.
-----------------------------------------------------------------X

**MEMORANDUM AND
ORDER**

07–CV–3226 (JMA)

A P P E A R A N C E S :

Marlen S. Bodden
The Legal Aid Society
199 Water Street, 3rd Floor
New York, New York 10038
(212) 577–3287
      *Attorney for Plaintiff*

Gerald Douglas
Douglas & Associates, P.C.
4517 Avenue D
Brooklyn, New York 11203
(718) 451–4900
      *Attorney for Defendants*

**AZRACK**, **United States Magistrate Judge:**

      On August 3, 2007, Kenneth Locke ("plaintiff" or "Locke") sued St. Augustine's

Episcopal Church ("St. Augustine's") and the Reverend Canon Howard K. Williams ("Rev.

Williams") (collectively, "defendants") pursuant to the Fair Labor Standards Act of 1938, 29

U.S.C. §§ 201–219 (the "FLSA"), and New York Labor Law §§ 190, 650 (2007, 2004) (the

"NYLL") for unpaid minimum wages, overtime compensation, and "spread of hours" pay, as

well as an additional equal amount in liquidated damages.  (Dkt. No. 1.)  On March 12, 2009, the

parties consented to my jurisdiction for all purposes pursuant to 23 U.S.C. § 636. (Dkt. No. 26.)

By motion dated December 15, 2009, defendants filed for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (Dkt. No. 35.) For the reasons set forth below, the Court grants defendants' motion. Specifically, the Court lacks subject matter jurisdiction over the action because the FLSA does not cover St. Augustine's as an enterprise engaged in commerce or in the production of goods for commerce or Locke as an individual employee engaged in commerce or in the production of goods for commerce. The Court declines to exercise supplemental jurisdiction over the state law claims and dismisses these claims without prejudice.

## I. FACTUAL BACKGROUND

The Episcopal Church of the United States (the "Episcopal Church") oversees 111 geographic areas, known as dioceses. (Pl. 56.1 Stmt. ¶ 4; Aff. of Chancellor Robert Fardella, St. James Church, Elmhurst v. Episcopal Diocese of Long Island, et al., No. 22564/05 (N.Y. Sup. Ct. Apr. 29, 2008) ("St. James Church, Elmhurst") ("Pl. Ex. C") ¶ 6; Aff. of Rev. Dr. J. Robert Wright, St. James Church, Elmhurst ("Pl. Ex. F") ¶ 6.) The dioceses oversee 7,600 worshipping congregations, known as parishes. (Pl. Ex. F ¶ 6.) The parishes serve 2.5 million congregants. (Id.) As a function of the hierarchical structure of the Episcopal Church, parishes are bound by church canons, cannot take action in conflict with the decisions of the dioceses or Episcopal Church, and cannot unilaterally disaffiliate from either. (Pl. 56.1 Stmt. ¶ 5; Pl. Ex. C ¶ 4b; Aff. of Dr. Robert Bruce Mullin, St. James Church, Elmhurst ("Pl. Ex. E") ¶¶ 6–9, 35.) Parishes receive contributions from congregants and remit some of this income to the dioceses, and the dioceses contribute some income to the Episcopal Church. (Pl. 56.1 Stmt. ¶ 8; Pl. Ex. E ¶ 33.) The clergy of each parish may then receive the sacraments, baptize, educate, marry, and bury congregants, and lead regular worship. (Pl. Ex. E ¶ 33) Parishes also receive property, insurance, access to the Church Pension system, and funding beyond what congregants provide.

(Pl. 56.1 Stmt. ¶ 3, 7; Order for <u>St. James Church, Elmhurst</u> ("Pl. Ex. B") at 3; Pl. Exs. E ¶ 34, F ¶¶ 5, 26–36, 46.)

The Diocese of Long Island, New York ("the Diocese") is a diocese of the Episcopal Church. (Pl. Ex. C ¶ 10.) The Diocese maintains an Investment Fund and Medical Trust that provides pension and health benefits to clergy and employees. (Pl. 56.1 Stmt. ¶ 9, 16; Pl. Exs. D ¶ 3e, I.) The Diocese manages the payroll procedures of the parishes. (Pl. 56.1 Stmt. ¶¶ 67–68; Pl. Ex. J; Rev. Williams Dep. 26:13–27:6.) The Diocese issues a monthly newsletter, *The Dominion, News of the Diocese of Long Island* ("*The Dominion*"), to publicize fundraising efforts by the parishes, advice about fundraising, opportunities and accomplishments in philanthropy, notices and reviews of national and international conventions, community meetings, and youth events, opinion articles regarding ecclesiastic matters, messages from the Bishop, news and pictures of parishes, clergy, and, congregants, obituaries, and help-wanted advertisements. (Pl. 56.1 Stmt. ¶¶ 10–15, 17–66; Pl. Exs. G–DD, GG.)

St. Augustine's is a parish of the Diocese. (Pl. 56.1 Stmt. ¶ 1; Rev. Williams Dep. 21:20–22:3.) St. Augustine's owns four buildings on Avenue D in Brooklyn, New York. (Answer ¶¶ 6–7; Rev. Williams Dep. 31:3–7.) 4301 Avenue D houses the church and Noel Hall, a space for events. (Answer ¶ 7; Rev. Williams Dep. 31:3–33:1, 44:11–15.) 4313 Avenue D houses a two-bedroom apartment, offices, a choir room, and a reception area ("the Annex Bldg."). (Answer ¶ 7; Rev. Williams Dep. 31:8–19.) 4314 Avenue D houses a Sunday school on the upper floor and a rental commercial space on the ground floor. (Rev. Williams Dep. 31:3–33:1.) An insurance company rented the ground floor space during some period after 1999. (Rev. Williams Dep. 31:18–33:1.) 4315 Avenue D houses a space for events ("the Patterson Bldg."). (Answer ¶ 7; Rev. Williams Dep. 31:3–33:1.)

St. Augustine's rents Noel Hall and the Patterson Bldg. for events, such as baptisms, bridal showers, memorial services, Election Day polling, and visits by state-run Elderplan, on any day of the week except Sunday.  (Rev. Williams Dep. 37:17–39:10; 49:12–17, 80:12–22; Defs.' Ex. 12.)  St. Augustine's charges $350 for funerals, $300 for memorial services, $210 per day to the Board of Elections, $200 for weddings, and $75 for baptisms.  (Defs.' Ex. 12.)  Events generally begin as early as two in the afternoon and end as late as two in the morning.  (Locke Dep. 173:14–12; Rev. Williams Dep. 39:11–23.)

Rev. Lloyd Henry ("Rev. Henry") served as Rector of St. Augustine's until 1999.  (Rev. Williams Dep. 23:8–15.)  In 1982, Rev. Henry hired Locke to clean the church.  (Compl. ¶ 12; Locke Dep. 17:8–19, 33:20–24; Defs.' Summ. J. Mem. at 4; Rev. Williams Dep. 23:8–15, 30:21–31:2.)  Locke became the sole custodian and caretaker of St. Augustine's.  (Answer ¶ 14; Locke Dep. 33:20–24.)  Locke worked seven days a week.  (Pl. 56.1 Stmt. ¶ 71; Locke Dep. 35:4–36:25.)  On Sundays, Locke worked from seven in the morning until services ended and he cleaned the church.  (Locke Dep. 37:25–42:3.)  On all other days, Locke worked from eight in the morning until five in the evening, though he often cleaned the church after evening services.  (Id. at 42:4–20, 47:3–20.)  Locke's custodial duties included sweeping, mopping, and vacuuming the buildings and bathrooms, removing garbage, flushing the air conditioner, maintaining the boiler, and clearing the sidewalks of trash, leaves, and snow.  (Pl. 56.1 Stmt. ¶¶ 72–75; Locke Dep. 55:4–68:21, 130:6–132:21; Rev. Williams Dep. 44:21–45:16, 46:3–5.)  Locke was on-call at all hours if a problem arose with the electricity, plumbing, air conditioner, or boiler.  (Pl. 56.1 Stmt. ¶ 81; Locke Dep. 78:24–79:24.)  When Rev. Williams joined St. Augustine's in 1999, he increased the hours Locke worked by requiring him to turn off the building's alarm at seven

every morning and turn on the alarm after church functions concluded every evening. (Locke Dep. 52:14–54:19, 77:3–8, 96:12–17; Rev. Williams Dep. 47:1–48:2.)

Locke paid the electrical, plumbing, and oil vendors on behalf of St. Augustine's, purchased cleaning supplies from Murray's Hardware located around the corner, picked-up church vestments and Rev. Williams' personal clothing from the dry-cleaners located across the street, delivered mail to the post office, and folded 800 church bulletins each week or took the bulletins to a local printing shop. (Pl. 56.1 Stmt. ¶¶ 81–84; Locke Dep. 139:3–21, 176:18–188:24, 193:8–202:9; Defs.' Summ. J. Mem. at 4; Rev. Williams Dep. 56:6–56:18.) St. Augustine's reimbursed Locke by check for these church-related purchases. (Pl. 56.1 Stmt. ¶ 77; Locke Dep. 138:7–139:21; Pl. Ex. RR; Rev. Williams Dep. 63:13–20; Defs.' Ex. 11.)

From 1982 until 2007, Locke lived in the two-bedroom apartment located in the Annex Bldg. (Locke Dep. 22:17–24:2.) Beginning in 1982, Locke earned $70 per week in wages and lived in the apartment rent-free. (Id. at 21:16–17, 22:14–16, 23:25–24:2.) In October 1986, the Finance Committee of St. Augustine's began requiring Locke to pay $250 per month in rent for the apartment. (Id. at 24:3–25; Defs.' Summ. J. Mem. at 4; Defs.' Ex. 3.) St. Augustine's did not require Locke to pay utilities other than his telephone bill. (Locke Dep. 29:15–18.) In 2000, defendants increased Locke's bi-weekly wage to approximately $519.76. (Locke Dep. 116:11–14; Pl. Ex. RR; Defs.' Ex. 11.) In 2002, defendants increased Locke's bi-weekly wage to $625.00; Rev. Williams believed this amount constituted adequate compensation for forty hours of work per week. (Defs.' Summ. J. Mem. at 4; Rev. Williams Dep. 52:17–53:7.) In addition to his wages, Locke received $50 per event for helping during each event and cleaning afterward. (Pl. 56.1 Stmt. ¶¶ 78–79; Locke Dep. 106:19–115:9, 175:10–24; Pl. Ex. RR; Rev. Williams Dep. 40:14–42:18; 49:12–17; Defs.' Summ. J. Mem. at 4.) Locke received Christmas bonuses, though

not every year.  (Locke Dep. 132:22–13:12; Rev. Williams Dep. 70:23–71:1.)  Defendants paid

Locke when he worked during a predetermined vacation time.  (Locke Dep. 123:13–124:9; Rev.

Williams Dep. 71:13–21.)  No one at St. Augustine's recorded the hours Locke worked.  (Locke

Dep. 34:10–35:3, 128:2–20; Rev. Williams Dep. 29:19–24, 52:17–54:3.)  In 2004, defendants

paid two additional people, Yvonne and Sanford Jones, to clean the buildings.  (Rev. Williams

Dep. 96:5–99:4; Defs.' Ex. 11.)  Defendants also employ clergy and an administrative staff.

(Rev. Williams Dep. 12:16–20:12.)

In September 2005, Locke requested medical leave to undergo surgery and receive

treatment.  (Compl. ¶ 23; Locke Dep. 144:4–10.)  Throughout his convalescence, Locke

continued to turn the alarm off and on every day and perform some of his custodial duties, such

as shoveling snow and vacuuming the church, and defendants continued to pay Locke.  (Locke

Dep. 150:5–153:20.)  In February 2006, Locke provided defendants with a letter from his doctor

stating that Locke could return to work full-time on March 13, 2006.  (Compl. ¶ 23.)  On

February 10, 2006, Rev. Williams and Assisting Priest Eric Stephens met with Locke and

terminated his employment because defendants "could no longer afford to wait for Mr. Locke

and decided instead to let him go."  (Answer ¶ 26; Locke Dep. 158:24–159:8; Def. Summ. J.

Mem. at 5.)  Defendants offered Locke several severance packages, but Locke rejected them.

(Answer ¶ 27; Locke Dep. 159:12–162:21.)

Defendants advertised for an interim custodial engineer who would be "required to work

flexible hours for a seven day work week . . . . Responsibilities include the opening and closing

of church properties during the week for services, church activities and events.  Oversee monthly

supply inventory needs for replacement of consumable items.  Knowledge of heating and

ventilation a plus."  (Pl. 56.1 Stmt. ¶ 76; Pl. Ex. PP.)  Defendants hired a new custodian who

receives a housing stipend of $700 per month.  (Rev. Williams Dep. 18:18–24.)  Locke remained

in the Annex Bldg. apartment from his termination in February 2006 until defendants removed

him in February 2007; Locke paid $500 in rent during this period.  (Locke Dep. 167:10–170:9;

Defs.' Summ. J. Mem. at 5.)  In 2006, defendants valued the apartment at $1,250 per month.

(Rev. Williams Dep. 48:10–22.)  Locke now lives in a basement apartment at 1464 East 45th

Street, Brooklyn, New York.  (Locke Dep. 3:13–14.)

On August 3, 2007, Locke sued defendants to recover unpaid minimum wages and

overtime compensation pursuant to the FLSA, and unpaid minimum wages, overtime

compensation, and "spread of hours" pay pursuant to the NYLL, as well as an additional equal

amount in liquidated damages pursuant to the FLSA and NYLL.  (Compl. ¶ 1.)  Locke also

complained that defendants failed to maintain adequate written records for hours worked and

wages earned in violation of the FLSA and NYLL.  (Id.)  On December 15, 2009, defendants

filed a motion for summary judgment on the ground that the Court lacks subject matter

jurisdiction over the action.  (Defs.' Summ. J. Mem. at 3.)  Defendants maintain that the FLSA

does not cover St. Augustine's as an enterprise or Locke as an individual employee.  (Id.)

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the primary purposes of this Rule "is to

isolate and dispose of factually unsupported claims."  Celotex Corp., 477 U.S. at 323–24.  The

substantive law of the action determines which facts are material and "only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1988) (internal

citations omitted); <u>Konikoff v. Prudential Ins. Co. of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000). "The

moving party is 'entitled to a judgment as a matter of law' . . . [where] the nonmoving party has

failed to make a sufficient showing on an essential element of . . . [the] case with respect to

which . . . [the nonmoving party] has the burden of proof." <u>Celotex Corp.</u>, 477 U.S. at 323.

"Once a moving party has made an initial showing that no genuine issue of material fact

remains, the nonmoving party may not refute this showing solely by means of conclusory

allegations, conjecture, and speculation, but must instead present specific evidence in support of

its contention that there is a genuine dispute as to material facts." Fed. R. Civ. P. 56(e); <u>Niagara</u>

<u>Mohawk Power Corp. v. Jones Chem., Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003). "A court [will]

resolve[] all ambiguities and draw[] all factual inferences in favor of the nonmovant, but only if

there is a genuine dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>In re</u>

<u>Novartis Wage & Hour Litig.</u>, 593 F. Supp. 2d 637, 647 (S.D.N.Y. 2009). "The mere existence

of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of

<u>material</u> fact." <u>Scott</u>, 550 U.S. at 380 (emphasis in original).

**B.**      **<u>Local Rule 56.1</u>**

Rule 56.1 of the Local Rules of the United States District Courts for the Southern and

Eastern Districts of New York requires a party moving for summary judgment to submit "a

separate, short and concise statement, in numbered paragraphs, of material facts as to which the

moving party contends there is no genuine issue to be tried." Local Rule 56.1(a); <u>Giannullo v.</u>

<u>City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003). "Failure to submit such a statement may

constitute grounds for denial of the motion." Local Rule 56.1(a). Defendants did not file a 56.1 statement. Such a failure constitutes grounds for denial of this motion.

Yet, courts have discretion to overlook a party's failure to comply with local rules, including Rule 56.1. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001); Doe v. Nat'l Bd. of Podiatric Med. Examiners, No. 03–CV–4034, 2004 U.S. Dist. LEXIS 7409, at *9 (S.D.N.Y. Apr. 29, 2004) (overlooking moving party's failure to file a 56.1 statement); United States v. Abady, No. 03–CV–1683, 2004 U.S. Dist. LEXIS 3775, at *7 (S.D.N.Y. Mar. 9, 2004) (overlooking moving party's failure to file a 56.1 statement despite reminder by nonmoving party). While not dispositive to the exercise of the Court's discretion, Locke does not raise defendants' failure to comply with Rule 56.1 as a ground for denying the motion for summary judgment. The Court will not deny defendants' motion simply because defendants failed to file a 56.1 statement.

C.      **The FLSA**[1]

The FLSA requires that an employer pay minimum wages and an overtime wage of not less than one and one-half times the regular rate for hours worked in excess of 40 hours in a single work week if an employee is either (1) employed by an enterprise engaged in commerce or in the production of goods for commerce, or (2) engaged in commerce or in the production of goods for commerce. 29 U.S.C. §§ 206, 207(a)(1) (2007, 2000). The two categories are commonly referred to as "enterprise" and "individual" coverage, respectively. Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295 n.8 (1985); Jacobs v. N.Y. Foundling Hosp., 577 F.3d 93, 96 (2d Cir. 2009).

---

[1] Congress enacted the FLSA to protect all covered workers from substandard wages and other ills of an oppressive workplace and drafted a statutory scheme to grant individual employees broad access to the courts. 29 U.S.C. § 202(a) (1974); Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 730–40 (1981); Jacobs v. N.Y. Foundling Hosp., 483 F. Supp. 2d 251, 256 (E.D.N.Y. 2007). Defendants question Locke's motive in bringing this wage-and-hour action. (Locke Dep. 7:21–20, 51:21–52:13; 73:11–74:16; 172:3–23.) Locke's motive has no relevance.

The employee bears the burden of establishing the jurisdictional prerequisite of either enterprise or individual coverage. Boekemeier v. Fourth Universalist Soc'y in the City of New York, 86 F. Supp. 2d 280, 285 (S.D.N.Y. 2000) ("Interpretation of the FLSA [presents] a federal question and determines the court's jurisdiction over the current case."). The burden then shifts to the employer to establish a specific exemption. Reiseck v. Universal Communs. of Miami, Inc., No. 09–CV–1632, 2010 U.S. App. LEXIS 497, at *7 (2d Cir. Jan. 11, 2010); 29 C.F.R. § 779.101 (1970).

### a.  Enterprise Coverage

The FLSA does not cover St. Augustine's as an enterprise engaged in commerce or in the production of goods for commerce. The FLSA covers an "'enterprise' engaged in commerce or in the production of goods for commerce" where (1) employees engaged in commerce or in the production of goods for commerce, or employees handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce by any person, and (2) the enterprise has no less than $500,000 in annual gross volume of sales made or business done. 29 U.S.C. § 203(s)(1)(A).

### i.  Definition of an Enterprise

St. Augustine's does not constitute an enterprise. An entity constitutes an enterprise where "the related activities performed (either through unified operation or common control) by any person or persons [are] for a common business purpose . . . ." 29 U.S.C. § 203(r); Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 465–66 (S.D.N.Y. 2006) (reducing the definition of an "enterprise" to a three-part test: "(1) the entity or entities must engage in related activities, (2) performed through unified operation or common control, (3) for a common business purpose.").

## 1. **Related Activities Performed Through Unified Operation or Common Control**

Locke does not claim that St. Augustine's constitutes an enterprise based upon the activities performed by St. Augustine's alone. (Pl. Opp. Mem. at 2–7, 10–17.) Locke maintains that the Diocese constitutes an enterprise and St. Augustine's as a parish of the Diocese can share this enterprise coverage. (Id.) In other words, Locke seems to argue that the Diocese and St. Augustine's perform "related" activities through "unified operation or common control." Scott, 550 U.S. at 380.

Activities of more than one entity are "related" where the entities "provide mutually supportive services to the substantial advantage of each entity." Archie v. Grand Cent. P'ship, 997 F. Supp. 504, 525 (S.D.N.Y. 1998). Entities constitute a "unified operation" by performing activities as "a single business unit or an organized business system which is an economic unit directed to the accomplishment of a common business purpose." Id. at 526 (quoting 29 C.F.R. § 779.217 (1970)). "Common control" exists between entities "where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together." Id. (quoting 29 C.F.R. § 779.221 (1970)).

St. Augustine's performs the following activities: (1) conducts religious services, (2) accepts charitable contributions, (3) operates a Sunday school and conducts music lessons, (4) sells candles and wafers, (5) employs clergy, administrative staff, and more than one custodian, (6) rents Noel Hall and the Patterson Bldg. for social events, election-day polling, and healthcare fairs, (7) and rented the two-bedroom apartment in the Annex Bldg. to Locke from 1982 to 2007 and the ground floor of 4314 Avenue D to an insurance company during some period after 1999.

To support the claim of unified operation or common control, Locke describes the hierarchical structure of the Episcopal Church where parishes financially support the dioceses

and in return receive administrative and financial support and the right to perform religious activities. Locke submits numerous editions of the *The Dominion* to illustrate that through the performance of fundraising, clergy travel, and entering into contracts with construction companies and financial advisors, the Diocese and parishes operate as a single unit or the Diocese controls the parishes.[2]

However, the Diocese is not a party to this action. Even though Locke does not assert claims against the Diocese, Locke implicates the activities of the Diocese to establish every element of enterprise coverage. If Locke asserts that separate entities perform related activities through unified operation or common control, then Locke must name each entity as a defendant in the action. See Archie, 997 F. Supp. at 508, 511–24 (bringing suit against two business associations and a drop-in center for the homeless to assert that the entities performed related activities through unified operation or common control); Robles v. Argonaut Rest. & Diner, Inc., No. 05 –CV–5553, 2009 U.S. Dist. LEXIS 96949, at *7–9 (S.D.N.Y. Oct. 9, 2009) (bringing suit against two restaurants and the shared owner to assert that the owner controlled both entities as a single enterprise); Gonzalez v. El Acajutla Rest. Inc., No. 04–CV–1513, 2007 U.S. Dist. LEXIS 19690, at *20–21 (E.D.N.Y. Mar. 20, 2007) (bringing suit against a restaurant, deli, and the shared owner to assert that the owner controlled both entities as a single enterprise by commingling funds and using the same employees interchangeably); Bowrin, 417 F. Supp. 2d at 459 (bringing suit against a nonprofit organization to assert that the nonprofit operated four residential mental health institutions in a unified manner). The Court cannot consider the

---

[2] *The Dominion* mentioned St. Augustine's only twice in four years – in 2003 when St. Augustine's satisfied an $80,000 loan owed to the Diocese and in 2004 when Rev. Williams became Rector – in addition to a quarterly review of the contributions each parish raised from congregants.

Diocese in determining whether St. Augustine's constitutes an enterprise because the Diocese is not a party to this action.[3]

## 2. **Business Purpose**

St. Augustine's does not perform activities for a business purpose. A Department of Labor ("DOL") regulation provides nonprofit organizations with an exemption from the definition of an "enterprise."[4] 29 C.F.R. § 779.214 (1970). An organization that performs religious, educational, or charitable activities does not perform these activities for a "business purpose," and thus does not constitute an enterprise, unless the activities compete in the marketplace with ordinary commercial enterprises. Alamo Found., 471 U.S. at 296–97 (noting the "considerable weight" given to the business purpose of an entity in determining whether an

---

[3] Even if Locke had sued the Diocese, the Court would not reach the merits of whether the Diocese constitutes an enterprise because summary judgment would be granted in favor of the Diocese on the threshold question of FLSA coverage. The FLSA applies only to an "employer" who "suffers or permits" an "employee" to work. 29 U.S.C. § 203(d), (e)(1), (g) (1999). If Locke sued the Diocese and St. Augustine's, then Locke would have the burden of proving that he constitutes an employee of the Diocese or an employee of both the Diocese and St. Augustine's as joint employers. Zheng v. Liberty Apparel Co., 355 F.3d 61, 66–69 (2d Cir. 2003). The Second Circuit has identified nonexclusive factors to aid the courts in determining the "economic reality" of the relationship between an individual and an alleged employer, such as whether the alleged employer (1) had the power to hire and fire the individual, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Brock v. Superior Care, Inc., 840 F.2d 1054, 1058 (2d Cir. 1988); Kaur v. Royal Arcadia Palace, Inc., 643 F. Supp. 2d 276, 292–93 (E.D.N.Y. 2007). Where an individual alleges that two entities constitute joint employers, courts must also consider whether both entities have "functional control over workers even in the absence of the formal control measured by the . . . [preceding] factors." See Zheng, 355 F.3d at 72.

Considering all factors and facts to ascertain the economic reality here, Locke constituted an employee of St. Augustine's alone. Employees of St. Augustine's had the power to hire and fire Locke; Rev. Henry hired Locke in 1982 and Rev. Williams fired Locke in 2006. Revs. Henry and Williams supervised and controlled Locke's work schedule and conditions of employment; Rev. Henry required Locke to work seven days a week from eight in the morning until at least five in the evening and Rev. Williams increased the hours Locke worked to include turning off the building's alarm at seven every morning and turning on the alarm after church functions concluded every evening. Revs. Henry and Williams determined the rate and method of payment; Rev. Henry paid Locke $70 per week from 1982 until 1999 and Rev. Williams increased Locke's wages to $519.76 in 2000 and $625.00 in 2002. Checks used to pay Locke for all wages and reimbursements were printed with the account name and address "St. Augustine's Episcopal Church, 4301 Avenue D, Brooklyn, New York 11203" and signed by employees of St. Augustine's. Neither the Diocese nor St. Augustine's maintained employment records. There is no evidence that the Diocese had any control over Locke's work as a custodian for St. Augustine's. Locke could not prove that the Diocese and St. Augustine's constitute joint employers. The Diocese is not relevant in this action or in theory.

[4] However, the FLSA also lists types of entities that constitute an enterprise regardless of nonprofit status. 29 U.S.C. § 203(s)(1)(B). Though defendants conduct a Sunday school, (Rev. Williams Dep. 32:12–32:15), Locke does not argue that this type of school constitutes an enterprise as listed by the FLSA and there is no evidence in the record that it does.

employer constitutes an enterprise); 29 C.F.R. § 779.214.  Congress recognized that "a church which has a business operation on the side" should not be exempt from the FLSA.  Alamo Found., 471 U.S. at 296–98; Boekemeier, 86 F. Supp. 2d at 286.  Yet, "[c]harging a fee for services does not necessarily render a non[]profit . . . a 'business enterprise.'"  Genarie v. PRD Mgmt., No. 04–CV–2082, 2006 U.S. Dist. LEXIS 9705, at *29–30 (D.N.J. Feb. 17, 2006).  To determine whether a nonprofit can establish the exemption from the definition of an "enterprise," a court must "scrutinize[e] the activities at issue by reference to objectively ascertainable facts" and find whether the activities of the nonprofit compete with ordinary commercial enterprises to serve the general public, regardless of the "admixture of religious motivations."  Alamo Found., 471 U.S. at 298.

Only two courts have applied this test to a church.  In Alamo, a California church operated thirty-three businesses, including service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy, in three states.  Alamo Found., 471 U.S. at 292 n.1.  The Supreme Court found that the church constituted an enterprise because the businesses engaged in ordinary commercial activities that competed with other commercial enterprises, even though employees were "spreading the gospel."  Id. at 297.  The Court highlighted the fact that income from the businesses fueled church operations, as the church did not accept traditional charitable contributions and relied completely on income from the businesses.  Id. at 292.  In Boekemeier, a New York church employed a staff to solicit through monthly mass mailings, press releases, and advertisements intra- and interstate renters for events.  Boekemeier, 86 F. Supp. 2d at 282–83, 285–86.  The district court found that the church constituted an enterprise because the extent and result of the church's efforts to secure

rental activity competed directly with other commercial landlords and rental facilities.  Id. at 285–86.  The court also highlighted the fact that income from the rental activity supplemented church operations, as rental fees constituted eighty percent of the church's income.  Id. at 282.

Defendants have established that the nonprofit status of St. Augustine's exempts from the definition of "business purpose" the religious services and sale of candles and wafers as religious activities, fundraising from congregants as charitable activities, and the operation of a Sunday school and music lessons as educational activities.

A closer question presents itself regarding the extent of the rental activity and whether renting Noel Hall and the Patterson Bldg. for social events, the apartment to Locke, and the ground floor space to an insurance company competes with ordinary commercial enterprises to serve the general public.  In scrutinizing the rental of the buildings for social events, cancelled checks show that St. Augustine's paid Locke for working at fifty-three events from June 2000 to August 2005; this averages to an infrequent ten or eleven events per year.  (Pl. Ex. RR.)  St. Augustine's does not advertise or market the buildings for events.  (Defs.' Mem. Summ J. at 8.) There is no evidence that St. Augustine's employs a staff to solicit renters or that renters come from outside the congregation network or other states.  (Id.)  Income ledgers from two months in 2002 show that rental fees constituted only four percent of the income raised by St. Augustine's and the remaining income derived from charitable contributions.  (Defs.' Ex. 12.)  No reasonable factual inference can be drawn in favor of the claim that this activity competes with ordinary rental facilities to serve the general public or that St. Augustine's relied on rental income to support church operations, as in Boekemeier.

In scrutinizing the rental of the two-bedroom apartment to Locke, the record shows that St. Augustine's allowed Locke to live in the apartment rent-free from 1982 until 1986 and then

charged him $250 per month in rent from 1986 until 2006; after his termination, Locke paid $500 in rent from February 2006 until February 2007. Defendants value the apartment at $1,250 per month. The newly-hired custodian receives $700 per month as a housing subsidy. These facts support the conclusion that Locke received subsidized housing as a function of his seven-day-a-week, on-call job duties. There is no evidence that this activity competed with ordinary commercial realtors. The apartment rental did not serve the general public. In scrutinizing the rental of the ground floor space to an insurance company, the record contains no facts describing the nature, time span, or cost of the rental. Locke does not even argue that defendants performed this activity or the apartment rental for a business purpose.

The undisputed facts show that St. Augustine's does not perform rental activity as a "business operation on the side." Locke has not met the burden of establishing that St. Augustine's performed any activities for a business purpose. St. Augustine's does not constitute an enterprise.

ii. **Whether Employees Engaged in Commerce or in the Production of Goods for Commerce, or Employees Handled Goods or Materials That Have Been Moved In or Produced for Commerce**

Employees of St. Augustine's handled goods or materials that have been moved in or produced for commerce. The FLSA covers an enterprise where "employees engaged in commerce or in the production of goods for commerce, or employees handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C. § 203(s)(1)(A)(i).

Following the lead of Congress, courts have determined that employees "handled, sold, or otherwise worked on goods or materials that have been moved in or produced for commerce" where the employer's business consumed products in the course of operation. Archie, 997 F.

Supp. at 529–30 (noting that Congress identified soap used by maintenance personnel of a laundry as a material moved in interstate commerce extending enterprise coverage over the employer of the personnel).  Cleaning products purchased locally "have been moved in or produced for commerce," and custodians are employees who handle these products. Boekemeier, 86 F. Supp. 2d at 285 ("Plaintiff's handling of janitorial goods that have moved in commerce . . . [is] more than sufficient to invoke enterprise coverage."); Archie, 997 F. Supp. at 530 (concluding that bags, brooms, shovels, and pails used by sanitation workers "undoubtedly moved in interstate commerce to New York City"); Shim v. Millennium Group, No. 08–CV– 4022, 2009 U.S. Dist. LEXIS 6014, at *7–8 (E.D.N.Y. Jan. 28, 2009) (presuming that employees handled goods or materials moved in interstate commerce because "it is simply inconceivable that none of the . . . custodial . . . supplies . . . originated outside of New York").

St. Augustine's consumed cleaning products from Murray's Hardware in the course of operation.  Locke, Yvonne Jones, and Sanford Jones handled these local products when cleaning the buildings.  Locke has met the burden of establishing that employees of St. Augustine's handled goods or materials that have been moved in or produced for commerce.

### iii.  Whether the Enterprise Has No Less Than $500,000 in Annual Gross Volume of Sales Made or Business Done

The commercial income of St. Augustine's does not meet or exceed $500,000.  The FLSA will not cover an entity that has less than $500,000 in annual gross volume of sales made or business done.  29 U.S.C. § 203(s)(1)(A)(ii).  Charitable contributions donated to a nonprofit are not included in this calculation unless the organization solicited or used the contributions for the purpose of furthering commercial activities.  Boekemeier, 86 F. Supp. 2d at 286–87 ("Undoubtedly, the Church's rental income and special events income should be included in the Church's gross business volume calculation.").

Defendants concede that St. Augustine's may have an annual gross volume over $500,000. (Defs.' Summ. J. Mem. at 8.) Defendants explain that the majority of this income derives from charitable contributions and "charitable income does not support the church's incidental rental activities." (Id.) In February 2002, St. Augustine's earned at least $14,087.52 from charitable contributions, $2,050.06 from a loan repayment, $770 from the Board of Elections, $350 from a funeral, $95 from the sale of candles, and $250 in rent from Locke. (Defs.' Ex. 12.) In March 2002, St. Augustine's earned at least $10,349.53 from charitable contributions, $2,200 toward a fundraising cruise, $700 in tuition from music lessons, $300 from a memorial service, $225 from three baptisms, $200 from a wedding, $185 from the sale of candles, $25 from the sale of wafers, and $250 in rent from Locke. (Id.)

Locke claims that the failure of defendants to produce more than this snapshot of St. Augustine's income means that a jury could find that the commercial income exceeds $500,000. (Pl. Opp. Mem. at 16–17.) Yet, Locke offers no factual support for this conclusory allegation. Months of extended discovery produced the income ledgers summarized above. (Dkt. Nos. 11, 13, 19.) Locke does not claim that additional ledgers exist. There is no evidence in the record from which a jury could draw a reasonable inference that the commercial income of St. Augustine's amounts to at least $500,000 a year or that St. Augustine's solicited contributions for the purpose of furthering commercial activities. See Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 145 (2d Cir. 2002) ("If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper."); cf. Rohn Padmore, Inc. v. LC Play, Inc., No. 06–CV–498, 2010 U.S. Dist. LEXIS 1833, at *6 (S.D.N.Y. Jan. 11, 2010) ("A dispute as to a material fact is 'genuine,' and hence summary judgment is not appropriate . . . only 'if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'"). Locke has not met the burden of establishing that the commercial income of St. Augustine's meets or exceeds $500,000 in annual gross volume of sales made or business done.

Locke fails to make a sufficient showing on two of the three essential elements of enterprise coverage with respect to which Locke has the burden of proof. Defendants are entitled to summary judgment on this jurisdictional prerequisite because the FLSA does not cover St. Augustine's an enterprise engaged in commerce or in the production of goods for commerce.

### b. Individual Coverage

The FLSA does not cover Locke as an individual employee engaged in commerce or in the production of goods for commerce. The FLSA can cover an employee "engaged in commerce or in the production of goods for commerce" regardless of whether the employer constitutes an enterprise. 29 U.S.C. § 207(a)(1); Xelo v. Mavros, No. 03–CV–3665, 2005 U.S. Dist. LEXIS 21588, at *2 (E.D.N.Y. Sept. 29, 2005). ("Where a business fails to meet the enterprise requirements of the FLSA . . . a plaintiff's FLSA claim can survive summary judgment only if the plaintiff was engaged in commerce or in the production of goods for commerce."). An employee engages in commerce by "performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence)" between states. 29 C.F.R. § 779.103 (1970) (noting that "workers who regularly use the mails, telephone or telegraph for interstate communication" "engage in commerce"). This must be "a 'substantial part' of the employee's work." Boekemeier, 86 F. Supp. 2d at 287 (noting the insufficiency of "sporadic or occasional shipments of an insubstantial amount of goods"). The employee must be "so closely related to the movement of the commerce

as to be a part of it," as opposed to simply performing activities that "affect or indirectly relate to interstate commerce."  Id. (quoting McLeod v. Threlkeld, 319 U.S. 491, 497 (1943)).

The DOL also provides custodial employees with a specific ground for individual coverage where the employee "perform[s] maintenance and custodial work on the machinery, equipment, or premises where goods regularly are produced for commerce or from which goods are regularly shipped in interstate commerce."  29 C.F.R. § 779.116 (1970).

Locke likens himself to the plaintiff in Boekemeier, where the court found that the employee–custodian engaged in commerce by ordering cleaning supplies and equipment one to six times a year from out-of-state vendors by telephone and facsimile on behalf of the employer–church.  Boekemeier, 86 F. Supp. 2d at 283, 287.  The court reasoned that the employee purchased goods "important" to the employer in a "recurrent and frequent" manner.  Id. at 287.  Locke purchased cleaning supplies in a recurrent and frequent manner.  (Pl. Opp. Mem. at 8.)  Locke regularly contacted by telephone electrical, plumbing, and oil vendors, paid for their services, and received reimbursement from St. Augustine's.  (Id.)  Yet, the record shows that Locke purchased from and telephoned vendors within New York, such as Murray's Hardware for cleaning supplies and Keyspan for oil.  Locke does not maintain that any vendor hails from out-of-state.  Boekemeier is distinguishable from this case because the employee was closely related to the movement of commerce by purchasing goods directly from out-of-state vendors, while Locke simply affected commerce by purchasing goods from local vendors.

Locke may have delivered mail to the post office on a regular and recurrent basis.  (Locke Dep. 187:4–188:8; Defs.' Summ. J. Mem. at 13.)  Yet, DOL regulations make clear that this activity must be of an interstate nature to establish individual coverage.  29 C.F.R. § 779.102 (1970) ("The Act has applied since 1938 . . . to all employees . . . who are engaged in interstate .

. . commerce . . . ."); 29 C.F.R. § 779.103 (determining that "clerical and other workers who regularly use the mails, telephone or telegraph for interstate communication . . . ." are "engaged in commerce"); 29 C.F.R. § 776.10(b) (1957) (explaining "if the employee . . . uses such instrumentalities in obtaining or communicating information . . . across State lines, he comes within the scope of the Act as an employee directly engaged in the work of 'communication' between the State and places outside the State"). There is no evidence that mail delivered by Locke to the post office was of an interstate nature.

Finally, Locke cannot establish the specific ground for individual coverage provided by the DOL because there is no evidence in the record to support the claim that St. Augustine's regularly produced goods for commerce or regularly shipped goods in interstate commerce and that Locke worked on machinery or equipment that did so.

Locke fails to make a sufficient showing on the essential elements of individual coverage with respect to which Locke has the burden of proof. Defendants are entitled to summary judgment on this jurisdictional prerequisite because the FLSA does not cover Locke as an individual employee engaged in commerce or in the production of goods for commerce.

### D.    The NYLL

The Court declines to exercise supplemental jurisdiction over the state law claims brought by Locke. 28 U.S.C. § 1367 permits a federal court to exercise supplemental jurisdiction over claims within the same constitutional case or controversy as a claim over which the court has original jurisdiction. 28 U.S.C. § 1367 (1990); Guzman v. VLM, Inc., No. 07–CV–1126, 2008 U.S. Dist. LEXIS 15821, at *27 (E.D.N.Y. Mar. 2, 2008). The Court has original jurisdiction over the FLSA claims. 28 U.S.C. § 1331 (1980). Locke asserts claims under the NYLL for unpaid minimum wages, overtime compensation, and "spread of hours" pay, as well

as an additional equal amount in liquidated damages. N.Y. Lab. Law §§ 190, 650; (Pl. Opp. Mem. at 1.) The Court can exercise supplemental jurisdiction over the NYLL claims because the same working conditions and compensation also underlie the FLSA claims.

Yet, a court may decline to exercise supplemental jurisdiction where the "court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Indeed, the court "should ordinarily dismiss the state claims" "[w]hen all bases for federal jurisdiction have been eliminated." Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R., 85 F.3d 35, 39 (2d Cir. 1996) (declining to consider state law wage claim where the court dismissed the federal wage claims); Louisdor v. Am. Telecomms., Inc., 540 F. Supp. 2d 368, 374 (E.D.N.Y. 2008). Having dismissed all claims over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction and dismisses the state law claims without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment. Specifically, the Court lacks subject matter jurisdiction over the action because the FLSA does not cover St. Augustine's as an enterprise engaged in commerce or in the production of goods for commerce or Locke as an individual employee engaged in commerce or in the production of goods for commerce. The Court declines to exercise supplemental jurisdiction over the state law claims and dismisses these claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

Dated: March 3, 2010
Brooklyn, New York

_____
         /s/
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE